Filed 8/3/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ERNESTO AYON,<br><br>    Defendant and Appellant. | H047360<br>(Santa Clara County<br>Super. Ct. No. C1894504)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>**NO CHANGE IN JUDGMENT** |

The Attorney General's petition for rehearing is denied. There is no change in the judgment. The court orders that the opinion filed July 6, 2022, be modified as follows:

On page 17, at the beginning of the last paragraph, immediately under the heading labeled "***C.   Relevance of the Preexisting Drug Investigation***", the following sentence shall be inserted:  "Although not required for us to reach our conclusion, the preexisting drug investigation merits mention in this case."

Dated:                                         _____
                                                       Greenwood, P. J.


_____          _____
Grover, J.                                              Danner, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ERNESTO AYON,<br><br>        Defendant and Appellant. | H047360<br>(Santa Clara County<br> Super. Ct. No. C1894504) |

After the police saw defendant Ernesto Ayon commit two minor traffic violations, they stopped him in his car and detained him until a narcotics dog arrived. After the dog alerted to the presence of drugs, the police searched the car, wherein they found cocaine, methamphetamine, currency, and a scale. The trial court denied Ayon's motion to suppress the fruits of the search, and he pleaded no contest to five drug-related counts.

Ayon appeals from the denial of the motion to suppress. He contends the police unlawfully prolonged the duration of the stop in violation of his Fourth Amendment rights.

A careful reading of the record shows the stop was actually part of a preexisting drug investigation, and the police used the traffic infractions as pretext for the stop. While that fact does not by itself render the search unconstitutional, based on the evidence in the record viewed objectively—including police body camera videos of the stop—we hold the police unlawfully prolonged the traffic stop.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Procedural Background

The prosecution charged Ayon with five counts: count 1—transportation of cocaine (Health & Saf. Code, § 11352, subd. (a)); count 2—transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)); count 3—possession of a false compartment for storing controlled substances (Health & Saf. Code, § 11366.8, subd. (a)); count 4—possession for sale of cocaine (Health & Saf. Code, § 11351); and count 5—possession for sale of methamphetamine (Health & Saf. Code, § 11378).

Ayon moved to suppress the fruits of the search, and the trial court held hearings on the motion as set forth below. After the hearings, the trial court denied the motion to suppress.

Ayon then pleaded no contest to all five counts. The court suspended imposition of sentence and granted a five-year term of probation to include one year in county jail.

## B. Facts of the Stop

At the hearings on the motion to suppress, the prosecution presented the testimony of two police officers who had participated in the stop and search: Officer Scott Williams, who questioned Ayon during the search, and Officer Tony Diep, who handled the narcotics dog used to search Ayon's car. Defense counsel introduced two videos containing body camera footage from two officers and partial transcripts of those videos.[1]

### 1. Factual Overview

Ayon was driving on West Taylor Street in San Jose around 9:00 p.m. on June 19, 2018. Multiple law enforcement vehicles were behind him, including at least one plainclothes police officer. As Ayon was approaching the intersection at North San Pedro Street, he drove in the bicycle lane for about 50 to 70 feet before the start of the broken line where the right turn lane begins. As he approached the intersection, Ayon

---

[1] We do not rely on defense counsel's transcripts.

turned on his right turn signal to make a right turn onto North San Pedro Street, but the signal did not light up until Ayon had reached the crosswalk.

After Ayon completed the turn and drove for about two or three blocks on North San Pedro Street, the police stopped him, and an officer began questioning him as he sat in the car. The police took Ayon's license and registration, and transmitted his information to a dispatcher. About three and a half minutes into the stop, police ordered Ayon out of the car, and Officer Williams began questioning him.

Officer Williams asked Ayon for consent to search his car, but Ayon declined. After Ayon refused to consent to the search, the police used a narcotics dog to sniff around the outside of the car. After the dog "alerted," police searched the car and found $6,200 hidden in a compartment under the driver's side of the dashboard. An officer then discovered a secret compartment under the back seat of the car. The compartment had been designed to be opened with a secret switch, and the officer could not find the switch during the initial stop. After taking Ayon into custody, the police took the car to the department garage, where they forced the compartment open. Inside, they found 1,132 grams of cocaine; 73.5 grams of methamphetamine; and an additional $10,000 in currency. The police never obtained any warrants for the search or arrest.

### 2. Timeline of the Stop and Search

Defense counsel introduced body camera videos from two of the officers at the scene of the stop: Officer Burnett, who was one of the officers who first stopped Ayon, and Officer Williams, who conducted most of the questioning of Ayon. The videos from both officers' cameras were time stamped, and the two body cameras recorded many of the same events, but from two different angles. Comparing the simultaneous audio and video of those events with the time stamps on the two videos shows they were both synchronized to the same clock. The time stamps on the body cameras thereby establish an unambiguous timeline for the stop.

3

Officer Burnett's body camera began recording as soon as his car pulled up behind Ayon's car. The video shows Ayon's car had already stopped. Officer Burnett exited the passenger's side of his car and stood behind the right rear corner of Ayon's car while shining a flashlight into it. About a minute into the stop, another officer (identified later as Officer Vallejo) approached Ayon at the driver's side of his car and began talking to him. A third officer stood on the passenger's side and shined a flashlight into Ayon's car. About 20 seconds later, Officer Burnett transmitted Ayon's license plate number over the police radio, while Officer Vallejo returned to his car with what appears to be Ayon's license and registration in his hand. About two minutes into the stop, Officer Burnett's body camera shows him holding and examining Ayon's license and registration. About thirty seconds later, Officer Burnett transmitted Ayon's name and birthdate over the police radio.

Officer Williams's body camera started recording at two minutes and 15 seconds into the stop. The video shows him approaching the area of the stop from several car lengths behind it. About three minutes into the stop, Officer Williams approached Officer Burnett at his car and Officer Burnett handed Ayon's documents to Officer Williams. Officer Williams then gave the documents back to Officer Burnett, who got into his car with the documents in his hand.

Around three and half minutes into the stop, Officer Williams and another officer approached Ayon's car and asked him to get out, whereupon Ayon did so and an officer patted him down.

At three minutes and 32 seconds into the stop, the police radio reported back with the "returns" from Ayon's license, registration, and identifying information. The audio from the radio is obscured, but the word "valid" was transmitted.

Officer Williams then asked Ayon to walk to the police car behind them, where Officer Williams began talking with Ayon. Officer Burnett got out of his car and stood

4

next to them with Ayon's documents in his hand. Officer Williams told Ayon the police had stopped him because he had crossed into a bicycle lane.

At about four minutes and 20 seconds into the stop, Officer Williams asked Ayon if the police could "take a quick look" in his car. Ayon responded, "Um, you guys can, but I mean, for an infraction, for a moving violation?" Officer Williams said it was a "simple question" police ask as part of a traffic stop. Ayon again asked, "For a moving violation, I mean, don't I get a ticket and get on my way?" Officer Williams again asserted that it was part of the traffic investigation. Ayon stated his position that the law would not allow police to search his car for a traffic infraction, and the two men debated back and forth about whether that was accurate.

At that point, Officer Williams accused Ayon of "getting very hostile" and "very confrontational."[2] When Officer Williams asked again for consent to search the car, Ayon declined. Six minutes had elapsed since the start of the stop.

Immediately after Ayon declined to consent to a search, Officer Williams turned Ayon around, handcuffed his hands behind him, and told him he was arresting or detaining him "for my safety because of the way you're acting." After Ayon objected to being handcuffed for a traffic infraction, Officer Williams again asserted he handcuffed Ayon for "officer safety because you're being very aggressive." Officer Burnett continued to stand next to them with Ayon's documents in his hand.

At about eight minutes into the stop, Officer Williams asked another officer, "Did we request a narco dog yet?" Officer Williams also inquired over the police radio whether there were any "narco dogs" that could be brought the location.

Officer Williams then began questioning Ayon about whether he had been using drugs. When Ayon said he had not, Officer Williams performed two physical tests on

_____

[2] The Attorney General concedes that at no time during the stop did Ayon act angrily, raise his voice, make any aggressive movement, or behave in any objectively hostile manner.

5

Ayon: Officer Williams examined his eyes with a flashlight and checked his pulse. The tests were completed by nine minutes and 45 seconds into the stop. For the next three minutes, Officer Williams continued to talk and stated he suspected Ayon was under the influence of drugs because Ayon was "acting strange." Officer Williams continued talking to Ayon and explained at length his reasons for stopping Ayon and the procedures that police follow during a traffic stop.

At 12 minutes and 45 seconds into the stop, Officer Diep arrived with a narcotics dog, and Officer Williams paused his interaction with Ayon to brief Officer Diep. At 13 minutes into the stop, Officer Williams asked Officer Diep to "just run the dog by the car real quick." For the next two or three minutes, Officers Williams and Burnett chatted with Ayon about miscellaneous topics or walked around nearby. At 14 minutes into the stop, Officer Williams made a request over police radio to run Ayon "statewide for any convictions."

At about 15 and a half minutes into the stop, Officer Burnett's body camera shows Officer Diep walking the narcotics dog towards Ayon's car, and an officer asks Officer Williams "to give the dog a little room to work," whereupon Officer Williams moves Ayon further away from the area of the car. Officer Williams continued to chat casually with Ayon while Officer Burnett began writing on a yellow index card. Officer Williams's body camera shows other officers standing around the area of the stop.

At 18 minutes and 45 seconds into the stop, Officer Williams was talking to Ayon when Officer Diep approached Officer Williams to report on the narcotics dog sniff. The two officers walked back to Ayon's car. At 19 minutes into the stop, Officer Diep told Officer Williams the narcotics dog had alerted at the rear passenger area on the driver's side.

Officer Williams turned off his body camera soon thereafter, stating "end contact." Audio from Officer Burnett's body camera shows Williams remained at the scene for some time and continued to interact with Ayon, among other things.

6

While Officer Williams searched Ayon's vehicle, Officer Burnett talked with Ayon. When Ayon raised the matter of the traffic infractions, Officer Burnett responded, "I generally don't make traffic stops to give tickets. I don't. That's not my intent. That's not why I'm making the stop. My intent is to make traffic stops, is to, and then in turn prevent crime from happening. Which is, i.e., guns, gangs, narcotics. I mean, warrants, parolee, probation, making sure they're doing all their things right."

Officer Burnett's body camera continued to record for a total of 61 minutes, at which time the stop and search was still underway.

### 3. Officer's Williams's Testimony

Officer Williams was assigned to the San Jose Police Department's Metro Unit, which specializes in narcotics investigations. He testified that he was driving two cars behind Ayon's vehicle prior to the stop. A police sergeant's car was directly behind Ayon. Officer Williams saw Ayon's vehicle cross into the bicycle lane on West Taylor Street, and Ayon illuminated his turn signal for the turn onto North San Pedro Street as the car entered the intersection. Officer Williams contacted the sergeant, who in turn instructed another police unit to make the stop. After the other officers stopped Ayon, Officer Williams parked, "donned a department-approved uniform," and approached the area of the stop.

Officer Williams testified that it is standard procedure in a traffic stop to contact the driver, request the driver's license and registration, and transmit the information to a radio dispatcher for a records check. They also make a check for "warrants and wants of an individual." Officer Williams testified that it generally takes a radio dispatcher three to five minutes to respond to a records request. Officers Burnett and Vallejo were the officers who conducted that request. Officer Williams testified that Ayon came back "clear," meaning he was "not wanted, valid driver's license." That information came back within three to five minutes.

7

Officer Williams testified that when he asked Ayon to step out of the car, Ayon appeared nervous, and all the windows of his car had been rolled down.[3] While Officer Williams explained to Ayon the reason for the traffic stop, Ayon was sweating even though it was not a "really hot night."[4] While Officer Williams was talking, Ayon became agitated and interrupted him. Based on these signs, Officer Williams suspected Ayon was under the influence of a controlled substance, so Officer Williams requested a narcotics dog.[5]

Officer Williams testified that he then performed sobriety tests on Ayon. Officer Williams testified, "I also was concerned because I asked him to close his eyes for a period of approximately 30 seconds and during that time he continuously would open his eyes."[6] Officer Williams testified that fluttering eyes are a sign of being under the influence. Officer Williams examined Ayon's pupils to see if they were dilated, and Officer Williams checked Ayon's pulse.[7]

Officer Williams testified that while he was interacting with Ayon, Officer Burnett was "standing by with me, I don't know exactly what he was doing. He was more or

---

[3] The videos show Ayon had rolled down the front window on the driver's side to speak with the police, but the windows on the passenger's side had not been rolled down.

[4] The videos do not show any visible signs of sweat on Ayon.

[5] Officer Diep, who handled the narcotics dog, testified he had been informed in advance of the car stop that his presence would be required. When defense counsel attempted to question him about this further, the trial court sustained the prosecution's objection on relevance grounds.

[6] The videos show this never occurred. Officer Williams twice asked Ayon to close his eyes, and Ayon did so both times. The second time, Officer Williams shined a flashlight into Ayon's closed eyes and they remained closed. Officer Williams never asked Ayon to close his eyes "for a period of approximately 30 seconds." When defense counsel attempted to cross-examine Officer Williams about this discrepancy, the trial court sustained multiple objections.

[7] The prosecution did not ask Officer Williams whether Ayon's eyes were in fact dilated or what Ayon's pulse was. Officer Williams testified on cross-examination that there was "very little change in the pupils" in response to the artificial light. There is no evidence in the record about the results of the pulse test.

8

less standing by with me being security, if you will, just watching." Officer Williams did not know what Officer Vallejo was doing. Officer Williams was not sure what time the radio dispatcher responded to the records check because Officer Burnett was handling that. Officer Burnett also filled out a field identification card.

Officer Williams testified that Officer Diep arrived "somewhere around ten minutes" from the start of the stop. Officer Williams briefed Officer Diep, whereupon Officer Diep returned to his car to retrieve the narcotics dog. Officer Williams testified that the dog sniff took "a minute, maybe two minutes at most," and Officer Diep reported back that the dog had alerted.[8]

When Officer Williams was asked on cross-examination whether it could have been 19 or 20 minutes from the time of the initial stop before the dog alerted, he responded, "Somewhere around in that area." Officer Williams conceded that he never did anything "to further the issuance of the Vehicle Code violation ticket." Once the search took place, Officer Williams never did anything further to investigate whether Ayon was under the influence of a controlled substance. The police never took a blood or urine test.

### 4. The Trial Court's Findings

The trial court found that the police did not have probable cause to search the car based solely on the suspicion Ayon was under the influence of a controlled substance. The prosecution argued instead that probable cause for the car search was established when the narcotics dog alerted. With respect to the timeline leading up to the arrival of the narcotics dog, the trial court found that the narcotics dog arrived and began sniffing the car approximately 10 to 11 minutes after the start of the stop. The trial court did not make any finding as to when the dog alerted.

---

[8] Officer Williams's body camera shows that five minutes and 50 seconds elapsed from the time he asked Officer Diep to conduct the dog sniff to the time when Officer Diep reported back.

9

As to whether Ayon prolonged the search himself by acting in a hostile manner and interrupting Officer Williams, the court stated, "I will simply note this within the body-camera footage and as depicted and reflected in the transcripts that were received in evidence as well, the following takes place between the officer and the defendant. The officer says, 'I asked you a yes-or-no question and you're being very hostile towards me.' And Mr. Ayon says, 'Yeah, yeah, yeah, I know that.' "

The court then found that under the totality of the circumstances, the police did not unduly or unreasonably prolong the detention. The court found "the officer's actions were objectively reasonable under the circumstances of this particular case" and "the time spent interacting with the defendant before the dog determined probable cause" was objectively reasonable to pursue "legitimate investigative pursuits."

## II. DISCUSSION

Ayon contends the trial court erred in denying his motion to suppress because the police unlawfully prolonged the traffic stop. He concedes he committed the traffic infractions that justified the initial stop, but he argues the stop became unlawful once police extended the detention for reasons unrelated to the purpose of the stop. The Attorney General contends the stop was lawful because it did not extend beyond the time required to perform ordinary traffic stop inquiries. For the reasons below, we hold the police unlawfully prolonged the stop.

### A. *Legal Principles*

"A seizure for a traffic violation justifies a police investigation of that violation." (*Rodriguez v. U.S.* (2015) 575 U.S. 348, 354 (*Rodriguez*).) A traffic stop begins once the vehicle is pulled over for investigation of the traffic violation. (*People v. McDaniel* (2021) 12 Cal.5th 97, 130.)

Because the traffic violation is the purpose of the stop, the stop "may 'last no longer than is necessary to effectuate th[at] purpose.' [Citation.]" (*Rodriguez, supra*, 575 U.S. at p. 354.) "[T]he tolerable duration of police inquiries in the traffic-stop

10

context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, [citation] and attend to related safety concerns." (*Ibid.*) "A police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation. [Citation.]" (*Id.* at pp. 350–351.) "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' [Citation.] Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. [Citation.]" (*Id.* at p. 355.) "There is no set time limit for a permissible investigative stop; the question is whether the police diligently pursued a means of investigation reasonably designed to confirm or dispel their suspicions quickly." (*People v. Russell* (2000) 81 Cal.App.4th 96, 102 (*Russell*).) An officer "may conduct certain unrelated checks during an otherwise lawful traffic stop." (*Rodriguez, supra*, 575 U.S. at p. 355.) But the officer may not do so "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." (*Ibid.*)

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362 (*Glaser*).) "Although our review of factual determinations is deferential, it is not without limit. Factual determinations must be supported by substantial evidence." (*People v. Morton* (2003) 114 Cal.App.4th 1039, 1048.) To satisfy the substantial evidence

11

standard, the evidence supporting the trial court's findings must be "reasonable, credible, and of solid value." (*People v. Elder* (2017) 11 Cal.App.5th 123, 130 (*Elder*).)

## B. *The Police Unlawfully Prolonged the Stop*

At the hearing, the prosecution took the position that probable cause for the car search arose during the sniff by the narcotics dog. It is well-established that an alert by a narcotics dog gives rise to probable cause for a vehicle search. (*Florida v. Harris* (2013) 568 U.S. 237, 248.) Accordingly, the relevant time frame started from the point at which the car was first pulled over and ended once the dog alerted to the presence of drugs in the car. The issue is whether police diligently pursued their investigation of the traffic infractions during that time. As detailed below, they did not.

When Officer Burnett pulled up behind Ayon's car and turned on his body camera, Ayon's car had already stopped. The record does not show exactly how long Ayon was stopped before Officer Burnett arrived, but the traffic stop had clearly been initiated by that point. Accordingly, for the purposes of establishing a timeline, we will assume the stop began when Officer Burnett pulled up behind Ayon and turned on his body camera.

Typical inquiries involved in a traffic stop include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." (*Rodriguez*, *supra*, 575 U.S. at p. 355.) After stopping Ayon and looking into his car with flashlights, the police approached him, collected his driver's license and registration, and called the information into the police radio for a records check. This took two minutes and 30 seconds. Officer Williams testified that a radio check of a driver's record typically takes about three to five minutes. In this case, the police radio dispatcher responded to the records request at three minutes and 32 seconds into the stop. Ayon's driver license was valid, there were no "wants" for him, and there is no evidence that anything transmitted by the dispatcher would have justified further investigation.

12

At no point, however, did any officer begin writing a traffic citation. To the contrary, the body camera video shows Officer Williams completely ignored the police radio response to the records check. He testified that he was not sure when the response came because, "Officer Burnett was handling that aspect of it." After the radio response to the records check, Officer Burnett stood next to Officer Williams for the next 12 minutes, at which point Officer Burnett got into his car and began writing on a yellow index card. Multiple other officers stood or walked around the scene of the stop during this period. Nothing in the record shows them doing anything to address the traffic infractions.

Officer Diep did not arrive with the narcotics dog until 12 minutes and 45 seconds into the stop. At that point, Officer Williams briefed Officer Diep, and Officer Diep went back to the car to retrieve the dog. It appears the sniff test began around 15 and a half minutes into the stop. At 18 minutes and 45 seconds into the stop, Officer Diep had completed the dog sniff and reported back to Officer Williams to tell him the dog had alerted. The videos do not show exactly when the dog alerted, but Officer Diep testified that it happened about 15 or 20 seconds before he reported back to Officer Williams. At this point in the stop, police had developed probable cause to search the vehicle. Accordingly, the record shows that more than 18 minutes had elapsed from the start of the stop before police had established probable cause to search the vehicle.

The Attorney General relies on the trial court's finding that the narcotics dog arrived around 10 to 11 minutes after the traffic stop began. The trial court did not explain how it calculated the time, but the timeline of the events as established by the videos shows this finding to be imprecise. Both officers' body cameras show that Officer Williams first spoke with Officer Diep at 12 minutes and 45 seconds, and Officer

13

Williams first asked Officer Diep to conduct the dog sniff at 13 minutes into the stop.[9] We do not defer to the trial court's finding on this point as substantial evidence does not support it. More importantly, the relevant event for Fourth Amendment purposes was the narcotics dog's alert to the presence of drugs. (*Rodriguez*, *supra*, 575 U.S. at p. 357.) The trial court made no finding about when that occurred, and the record establishes that the alert did not occur until more than 18 minutes into the stop.

Based on these events, we hold the police failed to diligently address the traffic infractions during the stop. They initially conducted the stop in standard fashion by taking Ayon's documents and requesting a records check over the police radio, but that portion of the investigation was completed within the first three and a half minutes of the stop. Officer Williams spent about a minute talking with Ayon about the traffic infractions, and after explaining the reason for the stop, Officer Williams requested consent to search the car. By his own admission, Officer Williams never did anything after that point in time to investigate the traffic infractions.

Officer Williams testified that Ayon himself prolonged the stop by interrupting Officer Williams and arguing with him. The videos show Ayon asking why it was necessary for police to detain him, handcuff him, and search the car for a traffic infraction. Ayon stated that the police were violating his legal rights, and he refused to consent to a search, but Ayon acted entirely within his rights at all times. The video evidence shows he did not raise his voice at any point, and although he verbally interrupted Officer Williams, he made no hostile, aggressive, or threatening movements.

Regardless, nothing Ayon said to Officer Williams prolonged the length of the investigation into the traffic infractions. It was Officer Burnett—not Officer Williams—

---

[9] The trial court may have relied on the time length of the video from Officer Williams's body camera, which shows he first spoke with Officer Diep at 10 minutes and 30 seconds into the video. But Officer Williams did not start his body camera until two minutes and 15 seconds into the stop.

14

who was in charge of conducting the records check. After receiving the response to the records check, Officer Burnett spent much of the stop standing next to Officer Williams watching him question Ayon. Around 16 minutes into the stop, Officer Burnett began filling out a field identification card, but there was no testimony that this was part of the investigation into a traffic infraction. The videos show multiple other officers standing or walking around the area throughout the stop. Apart from Officer Vallejo's initial contact with Ayon, there was no evidence any of these officers did anything to investigate the traffic infractions. In short, the police did not "diligently pursue[] a means of investigation reasonably designed to confirm or dispel their suspicions quickly." (*Russell*, *supra*, 81 Cal.App.4th at p. 102.) (See *Rodriguez*, *supra*, 575 U.S. at p. 352 [stop was unduly prolonged where narcotics dog alerted seven to eight minutes after completion of investigation for traffic infraction]; *People v. McGaughran* (1979) 25 Cal.3d 577, 587 [holding ten-minute delay unlawful where all that was reasonably necessary for a traffic violation was for police to examine defendant's license and registration, explain the violation, and then issue either a citation or a warning].)

The Attorney General argues that Officer Williams reasonably took time during the stop to investigate suspicions that Ayon was under the influence of a controlled substance. "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." (*Arizona v. Johnson* (2009) 555 U.S. 323, 333.)

Officer Williams testified that he thought it was necessary to perform sobriety checks because he believed Ayon was under the influence of a narcotic, but an officer's subjective intentions are irrelevant to the lawfulness of the search. (*Whren v. United States* (1996) 517 U.S. 806, 813 (*Whren*).) And considering the record objectively, including both the officer's testimony and the bodycam videos, there is no substantial evidence to support Officer Williams's claim that Ayon appeared to be under the

15

influence. The videos show that Ayon did not display any conduct demonstrating insobriety, such as slurred or irregular speech, an inability to walk or stand normally, confusion, or any other mental incapacity. His eyes did not flutter when the officer shined a light into them, and the results of any other tests the officer performed are absent from the record. Officer Williams ostensibly based his initial suspicions on Ayon's nervousness, but the videos do not show Ayon acting any more nervously than a typical person in a traffic stop. As Officer Williams conceded on cross-examination, "Most people are nervous when they are pulled over by the police."

Furthermore, the trial court made no express finding of credibility regarding any aspect of the officer's testimony on this point. The court ruled that the officer's actions were "objectively reasonable" and that the time spent prior to the arrival of the narcotics dog was "objectively reasonable under the totality of the circumstances while the officers were pursuing what objectively were legitimate investigative pursuits." But the reasonableness of the stop and whether the investigation was "legitimate" are legal determinations that we review de novo. (*Glaser*, *supra*, 11 Cal.4th at p. 362.) Arguably those rulings were based on implied findings of fact, but it is unclear precisely what factual findings are implied here. The trial court never made any factual findings as to whether Ayon exhibited signs of intoxication, for example, or whether the officers were diligently investigating the traffic violations throughout the period preceding the narcotics dog's alert.

But even assuming the sincerity of Officer Williams's stated suspicions, when viewing the facts objectively, Officer Williams continued to prolong the stop unlawfully. After completing the field sobriety tests, Officer Williams continued to talk for several minutes, repeating things he had already said about police procedures and the reasons for the stop. He further touched on topics completely unrelated to the traffic infractions or suspected drug use. These topics included Officer Williams's own youth and interactions with the police; the fact that he (Officer Williams) was harassed by the police himself in

16

the past for "riding my motorcycle all over the side of a mountain"; and how "some people just don't like the police" because of the way they were raised. Notwithstanding his subjective intentions, none of this conduct was reasonably designed to address either the traffic infractions or the suspected drug use from an objective standpoint. Viewing Ayon's conduct as recorded in the videos, we see no evidence that would establish reasonable suspicion or probable cause to believe he was under the influence of a controlled substance.

Furthermore, the dog sniff itself prolonged the stop. "The critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop' [citation.]" (*Rodriguez*, *supra*, 575 U.S. at p. 357.) The dog sniff here added six minutes to the length of the stop. During this period, Officer Williams talked to Ayon about numerous topics irrelevant to the car stop, including, among other things, Ayon's place of work and business; where he went to high school; Ayon's marital status and children; Officer Williams's own wife and children; Officer Williams's background as an auto mechanic; and the general nature of growing up in the San Jose area. Again, none of this conduct constituted a diligent investigation into the traffic infractions. Nor did this discussion pertain to any purported investigation of Ayon being under the influence of a controlled substance.

### C. Relevance of the Preexisting Drug Investigation

A close examination of the record shows the traffic infractions were not the actual motivation for the initial stop. Indeed, as Officer Burnett himself openly admitted on the video, he never intended to issue a citation, and he conceded that was not the motivation for the stop. Officer Williams was assigned to the San Jose Police Department's Metro Unit, which specializes in narcotics investigations. He was dressed in plainclothes just before the stop, and his vehicle was one of multiple law enforcement vehicles behind Ayon's vehicle when it turned onto North San Pedro Street. The officers were communicating with each other by radio while following Ayon, and they initiated the

17

stop through those radio communications. Officer Diep, who handled the narcotics dog, had been told before the stop that his presence with the dog would be required. When defense counsel attempted to question Officer Williams about the circumstances that led to the stop, Officer Williams repeatedly invoked his right not to answer those questions under Evidence Code sections 1040 and 1042.[10] It is apparent the police suspected prior to the stop that they would find drugs in Ayon's car, but the record holds no evidence of how they knew this.

During argument on the motion to suppress, defense counsel asserted the police were actually conducting a drug investigation. The prosecution below did not expressly deny this was a drug investigation but argued the officers' subjective intent was irrelevant. The trial court never addressed the matter on the record, but by sustaining multiple prosecution objections on relevance grounds, the court implicitly supported the prosecution's position. The Attorney General does not expressly deny the existence of a preexisting drug investigation but claims he "found no support for this assertion in the record on appeal."

As a general matter, pretextual traffic stops do not violate the Fourth Amendment. (*Whren, supra,* 517 U.S. 806.) Under *Whren* and its progeny, the police may use a minor traffic infraction as a justification for stopping a vehicle, even if the traffic infraction is

---

[10] Evidence Code section 1040 sets forth a privilege to refuse to disclose official information if "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . ." (Evid. Code, § 1040, subd. (b)(2).) Evidence Code section 1042 provides in part, "if a claim of privilege under this article by the state or a public entity in this state is sustained in a criminal proceeding, the presiding officer shall make such order or finding of fact adverse to the public entity bringing the proceeding as is required by law upon any issue in the proceeding to which the privileged information is material." (Evid. Code, § 1042, subd. (a).) The trial court made no express rulings on the officer's invocations of the privilege, but the court ordered defense counsel to ask different questions, impliedly sustaining the witness's claims of privilege. The trial court also sustained multiple objections by the prosecution on relevance grounds.

18

not the actual motivation from the stop. This doctrine follows from the general rule that an officer's subjective intent is irrelevant. (*Id.* at pp. 813-814.)

The existence of a preexisting drug investigation is nonetheless relevant here. In deciding whether a warrantless search or stop is objectively reasonable, we look to the "facts known to the officer." (*Adams v. Williams* (1972) 407 U.S. 143, 146; *People v. Troyer* (2011) 51 Cal.4th 599, 605.) Officer Williams testified as a fact witness about what he observed during the stop, and in the videos he made numerous statements about what he was observing at the time. Both during the stop and in his testimony about it, Officer Williams repeatedly accused Ayon of acting in a "hostile," "aggressive," "confrontational," and "strange" manner. Officer Williams blamed Ayon for prolonging the stop and claimed he suspected Ayon was using drugs based on this asserted behavior. Officer Williams testified that he ordered the narcotics dog after he became suspicious that Ayon was under the influence of something.

But the video shows Officer Williams requested a narcotics dog before conducting any purported sobriety checks, and the dog handler admitted he had been informed his presence would be required *before the stop had even occurred.* And Ayon's conduct as documented by the videos is at odds with Officer Williams's testimony. Although Ayon questioned why the police would ask to search his car and handcuff him in a routine stop for a traffic infraction, he was cooperative at all times. He showed no signs of hostility or aggression. The Attorney General concedes this much.

The fact of the preexisting drug investigation explains why Officer Williams prolonged the stop until the narcotics dog arrived. And, along with the video evidence, the fact of the preexisting drug investigation establishes that Officer Williams's testimony about what he observed during the stop was neither reasonable nor credible, and thus did not constitute substantial evidence under the relevant legal standard. Were it not for the body camera videos, which undermine Officer Williams's assertion that Ayon

19

appeared hostile or intoxicated, the outcome of this appeal likely would have been different.

The trial court made no express findings about the credibility of Officer Williams's testimony. The Attorney General argues that the court's ruling includes implicit factual findings, but we cannot infer from the ruling exactly what factual findings it implies or how those findings might have relied on Officer Williams's testimony. But here we have the benefit of the video evidence, which we can independently review. (See *People v. Duff* (2014) 58 Cal.4th 527, 551 [where interview of defendant was recorded, the facts of the confession are undisputed and reviewing court may apply independent review]; *People v. Linton* (2013) 56 Cal.4th 1146, 1177 [the facts of a confession are undisputed to the extent the interview is tape-recorded, making the issue subject to independent review]); *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [because the trial court's findings were based solely upon documentary evidence, reviewing court could independently review the record]). Even if the trial court's ruling implies factual findings based on the credibility of Officer Williams's testimony, the videos show any such findings are not supported by substantial evidence—i.e., evidence that is "reasonable, credible, and of solid value." (*Elder*, *supra*, 11 Cal.App.5th at p. 130.)

For the reasons above, we conclude the police failed to diligently pursue an investigation of the traffic infraction and instead unlawfully prolonged the stop. The Attorney General does not assert any other exceptions to the Fourth Amendment or that the error was harmless, and the record would not support such claims in any event. Accordingly, we will reverse the judgment.

### III. DISPOSITION

The judgment is reversed, the conviction is vacated, and the matter is remanded. On remand, the trial court shall vacate its order denying Ayon's motion to suppress the evidence seized in the car search and the court shall enter a new order granting that motion.

20

_____
Greenwood, P. J.


WE CONCUR:




_____
Grover, J.




_____
Danner, J.




People v. Ayon
H047360

Danner, J., concurring.

For the reasons set out in Part II(B) of the majority opinion, I agree that the officers here unlawfully prolonged the traffic stop and therefore the trial court should have granted the motion to suppress. I write separately, however, to note my disagreement with certain aspects of the opinion's analysis.

Whether the officers in fact effected this traffic stop as part of a preexisting drug investigation is, I believe, on this record neither relevant nor necessary to concluding the search of the car occurred outside the " 'time reasonably required to complete [the stop's] mission.' " (*Rodriguez v. United States* (2015) 575 U.S. 348, 357.) Evidence of such an investigation might have been relevant to assessing the credibility of Officer Williams's version of the facts of the traffic stop. But the trial court sustained the prosecution's objections to Ayon's questions on this topic, and Ayon has not challenged those rulings on appeal.

The majority opinion maintains "the traffic infractions were not the actual motivation for the initial stop" (maj. opn., *ante*, at p. 17) and "the fact of the preexisting drug investigation explains why Officer Williams prolonged the stop until the narcotics dog arrived." (*Id*. at p. 19.) These assertions may well be correct, although they rest on scant evidentiary support in the record. More importantly, it is settled that the Fourth Amendment analysis may not turn on an inquiry into an officer's motivation. "[T]he United States Supreme Court has made clear that an officer's subjective intent plays no role in the Fourth Amendment inquiry. 'An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed objectively, justify [the] action." [Citation.] The officer's subjective motivation is irrelevant.' ([*Brigham City v. Stuart* (2006) 547 U.S. 398,] 404, italics omitted; see also *Whren v. United States* (1996) 517 U.S. 806, 813.) . . . [J]ust as an officer's venial motives will generally not undermine an otherwise valid search, a

benign intent cannot save an invalid one." (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1052.)

With these observations, I join the majority opinion.

**H047360**
***People v. Ayon***

I CONCUR:

_____
Danner, J.

*H047360*
*People v. Ayon*

Trial Court:                                                Santa Clara County Superior Court
                                                           Superior Court No: C1894504

Trial Judges:                                              The Honorable Eric S. Geffon,
                                                           The Honorable Daniel T. Nishigaya


Attorneys for Defendant and Appellant                      Mark A. Arnold
ERNESTO AYON:                                              Arnold Law Firm




Attorneys for Plaintiff and Respondent                     Rob Bonta,
THE PEOPLE:                                                Attorney General of California

                                                           Lance E. Winters,
                                                           Chief Assistant Attorney General

                                                           Jeffrey M. Laurence,
                                                           Senior Assistant Attorney General

                                                           Donna M. Provenzano,
                                                           Supervising Deputy Attorney
                                                           General

                                                           Christen Somerville
                                                           Deputy Attorney General

People v. Ayon
H047360